RIKER, DANZIG, SCHERER, HYLAND & PERRETTI, LLP
Headquarters Plaza
One Speedwell Avenue
Morristown, NJ  07962-1981
(973) 538-0800

KIRKLAND & ELLIS
200 East Randolph Drive
Chicago, IL  60601
(312) 861-2000

FEDERAL BAR NO. MRO-7088

Attorneys for Defendants

|  |  |  |
|---|---|---|
| **LAIDLAW, INC. and LAIDLAW TRANSIT, INC.,** | : | **U.S. DISTRICT COURT FOR THE DISTRICT OF NEW JERSEY** |
| Plaintiffs, | : | |
| v. | : | **CIVIL ACTION NO. 98-2241 (WGB)** |
| **STUDENT TRANSPORTATION OF AMERICA, INC., DENIS GALLAGHER, ROBERT H. BYRNE, JOHN REDDAN, JOHN EMBERSON, JOHN CAREY, PETER PEARSON AND THOMAS GALLAGHER,** | : | **HON. WILLIAM G. BASSLER** |
| Defendants. | : | |

## DEFENDANTS' RESPONSE TO LAIDLAW'S MOTION TO EXCLUDE ALL EVIDENCE OF ITS ALLEGED BID-RIGGING IN NEW JERSEY

On June 24, 1998, this Court is scheduled to hold an evidentiary hearing on Laidlaw's motion for a preliminary injunction. Laidlaw contends that the individual defendants are violating various non-competition agreements by competing against Laidlaw in the New Jersey school bus transportation industry. As this Court is well aware, to obtain injunctive relief, Laidlaw must establish: (1) a reasonable likelihood of success on the merits; (2) irreparable

injury; (3) that the equities favor injunctive relief; and (4) that granting the relief will be in the public interest. *ECRI v. McGraw-Hill Inc.*, 809 F.2d 223, 226 (3d Cir. 1987); *M&R Marking Sys., Inc. v. Top Stamp, Inc.*, 926 F. Supp. 466, 469-70 (D.N.J. 1996). Thus, the standard for granting a preliminary injunction requires an affirmative finding by this Court that granting the relief requested is *in the public interest*. Moreover, injury to the public is an established factor that *must* also be weighed when determining the validity and enforceability of *any* non-compete agreements under New Jersey law. *Solari Industries, Inc. v. Maladay*, 264 A.2d 53, 56 (N.J. 1970) (covenant not to compete will only be enforced if it "is not injurious to the public interest"); *Coskey's Television & Radio Sales and Service, Inc.*, 602 A.2d 789, 793 (N.J. App. Div. 1992) (non-compete agreement "must not impair the public interest").

Laidlaw's proposed injunction in this case is clearly not in the public interest because it would stifle competition in an industry already lacking in competition. It is undisputed that the New Jersey Attorney General has filed criminal and civil charges against Laidlaw and six other companies for big-rigging in the New Jersey school bus transportation industry. New Jersey legislators and executive branch officers have noted the lack of competition in New Jersey, and there is currently a bill proposed in the New Jersey legislature to remedy this lack of competition. Thus, evidence of alleged bid-rigging and the lack of competition in the school bus industry is highly relevant in this case.

Bid-rigging in the New Jersey school bus transportation industry -- which directly affects all taxpayers as well as all companies that desire to compete on a level playing field -- bears directly on whether an injunction here would be in the public interest. Accordingly, Laidlaw's motion to exclude evidence of its alleged bid-rigging should be denied.

## BACKGROUND

I.   **Laidlaw's Indictment And The Anti-Competitive Landscape In New Jersey.**

Laidlaw admits that in January 1998 it was indicted for bid-rigging in New

Jersey. (Laidlaw Mem. 2 n.1)  The New Jersey Attorney General brought both criminal and civil

charges against Laidlaw and six other companies. Although Laidlaw contends that the

indictment and civil charges were the result of an isolated event and that competition is

otherwise robust in the industry, the New Jersey Senate Education Committee disagrees.

Pending N.J. Senate Bill 701, which is intended to "eliminate the abuses with the [school bus

transportation business] that drive up the cost of transportation services and thus increase the

financial burden on the State's taxpayers to provide those services," includes several critical

findings:

- "School transportation in New Jersey costs the taxpayers of the State approximately $503,000,000 per year."

- "The school bus industry in New Jersey has been vulnerable to abuse as evidenced by criminal investigations and prosecutions over the past several years."

- "Recently, seven school bus operators whose companies transport special education and vocational students in Monmouth and Ocean counties were indicted for allegedly conspiring to rig bids to obtain more than $2 million in transportation contracts."

- "It is therefore critical that changes to the school transportation contracting system be made in order to promote the existence of competitive conditions and to eliminate the abuses within the system that drive up the cost of transportation services and thus increase the financial burden on the State's taxpayers to provide those services." (Ex. A)

The impetus for Senate Bill 701 apparently was the report issued by the State of

New Jersey Commission of Investigation, which concluded:

- Conditions which foster and permit collusive bidding and related abuses are prevalent throughout New Jersey's school transportation system. Commission staff was told that collusion is "built-in," reflective of the fact

3

> that bus company owners routinely refuse to submit bids in districts where others already are operating. It is understood within the industry that some form of retaliation will result if this informal system of customer allocation is violated.

- Trends in pupil transportation in New Jersey reflect the appearance and growing dominance of large, multi-state bus companies that are both under-bidding and buying out smaller competitors.

(12/16/97 Commission Report, Ex. B)

## II.   Magistrate Judge Cavanaugh's Ruling.

For the second time, Laidlaw falsely asserts that Magistrate Judge Cavanaugh ruled that information regarding Laidlaw's alleged collusive activity is irrelevant to this dispute. As defendants have already explained,[1] Magistrate Judge Cavanaugh actually required Laidlaw to provide discovery on this critical issue. For example, Magistrate Judge Cavanaugh required Laidlaw to answer in open court the following interrogatory:

> Are the criminal and civil actions filed by the New Jersey State Attorney against Laidlaw Transit Inc. in January 1998 still pending? If not, explain how each of those matter was resolved and, if settled, the terms and amount of any settlement. (Ex. C, 5/29/98 Hearing at 9-11)

Although Magistrate Judge Cavanaugh did not require Laidlaw to produce additional documents regarding the indictment, he never ruled the issue was irrelevant. Instead, he simply concluded that Defendants "already got the information that there was an indictment. That's enough." (*Id.* at 15) Moreover, the Magistrate Judge certainly never suggested that information regarding the lack of competition in the school bus industry in New Jersey is irrelevant. Information regarding Laidlaw's indictment and the lack of competition in the school bus industry in New Jersey is not only relevant, but is highly probative in this dispute.

---

[1] *See* Defendants Response To Plaintiffs' Motion To Strike Exhibit "C" To Defendants Motion For Supplemental Preliminary Injunctive Relief at 4-6.

4

Notwithstanding Magistrate Judge Cavanaugh's ruling and the findings by New Jersey public officials, Laidlaw argues that the only public interest implicated here is its interest in enforcing the restrictive covenants. Laidlaw thus argues that bid-rigging allegations are irrelevant to the enforcement of the non-competes and are unfairly prejudicial. Both arguments should be rejected.

## ARGUMENT

### I.   Evidence Regarding Laidlaw's Collusive Activity In The New Jersey School Bus Industry Is Highly Relevant In This Dispute.

As explained above, evidence regarding the lack of competition in the New Jersey school transportation market, and Laidlaw's indictment for bid-rigging are clearly relevant in this case because such evidence bears on the public interest prong of the four-part preliminary injunction standard, and on the third prong of the *Solari* test. Indeed, this District Court has concluded that cases involving public contracts and public bidding statutes bear directly on the public interest. In *Cubic Western Data, Inc. v. New Jersey Turnpike Authority*, 468 F. Supp. 59, 71 (D.N.J. 1978), the court observed that, in the public bidding context, the public interest is served when a contract can be performed "at the lowest possible cost." *Cubic Western* goes on to hold that public bidding statutes in New Jersey "are construed with sole reference to the public good." *Id.* Laidlaw ignores this controlling case, and the numerous findings by New Jersey public bodies regarding the lack of competition in the school bus transportation industry. Instead of addressing these issues head on, Laidlaw attempts to end-run the relevancy issue by advancing two meritless arguments.

***First,*** regarding the sale of business non-competes, Laidlaw argues that because it believes it will ultimately prevail in its attempt to enforce the non-competes, the Court need not consider evidence regarding Laidlaw's pending indictment. (Laidlaw Mem. 6) Laidlaw's

5

suggestion that this Court should only minimally inquire into the reasonableness of Laidlaw's non-competes further demonstrates Laidlaw's intent to restrain competition in the New Jersey school bus transportation business. More importantly, however, Laidlaw puts the cart before the horse. It argues that because its non-competes undoubtedly will be enforced -- regardless of the "minimal" public interest -- evidence relating to the public interest should not be considered. Stated differently, Laidlaw contends that because it will win, any evidence suggesting that is should lose is irrelevant. That argument is nonsensical.

**Second**, Laidlaw contends that "[t]o the extent this Court does analyze the reasonableness of the Sale of Business Non-Competes," the Court need not consider the public interest because "it is generally recognized . . . that if the first two prongs [of the *Solari* test] are satisfied . . . then the public interest is also protected." (*Id.* at 7) Laidlaw contends the public interest is only implicated if a monopoly would result. (*Id.* at 6) That argument, in addition to ignoring the holding in *Cubic Western*, simply makes no sense. The *Solari* test has three prongs, not two. If the New Jersey Supreme Court had intended that satisfying the first two prongs would also satisfy the public interest prong, it never would have included a third prong.[2]

## II.    Evidence Regarding Laidlaw's Bid-Rigging Is Not Unfairly Prejudicial.

Evidence regarding Laidlaw's alleged collusive activities -- like all evidence -- is indeed prejudicial. But prejudice, of course, is not the controlling factor. *See e.g., McQueeney v. Wilmington Trust Co.*, 779 F.2d 916, 923 (3d Cir. 1985) ("Virtually all evidence is prejudicial or it isn't material. The prejudice must be 'unfair.'") (citation omitted). Laidlaw provides no justification for why evidence of its collusive activities somehow *unfairly* prejudices its attempt to restrain competition further. If anything, the public interest will be prejudiced if Laidlaw's

---

[2] The cases cited by Laidlaw simply do not relate to public bidding statutes or public contracts, and are thus irrelevant to the analysis here.

collusive activities are not considered by this Court. Because evidence regarding Laidlaw's

collusive activities is highly probative and not unfairly prejudicial, Laidlaw's "prejudice"

argument should be rejected.

## CONCLUSION

The evidence relating to Laidlaw's collusive activities in the New Jersey school

bus transportation industry is clearly relevant in this dispute. It is not unfairly prejudicial. Thus,

this Court should deny Laidlaw's motion *in limine* to exclude such evidence.

Dated: June 22, 1998                     Respectfully submitted,


Thomas O. Kulns
Brian D. Sieve
Ellen Therese Ahern
James C. Joslin
KIRKLAND & ELLIS
200 East Randolph Drive
Chicago, IL  60601
(312) 861-2000

Gerald A. Liloia
Michael R. O'Donnell
RIKER, DANZIG, SCHERER, HYLAND
 & PERRETTI, LLP
Headquarters Plaza
One Speedwell Avenue
Morristown, NJ  07962-1981
(973) 538-0800

By: GERALD A. LILOIA

7

|  |  |  |
|---|---|---|
| LAIDLAW, INC. and LAIDLAW TRANSIT, INC., | : : : | U.S. DISTRICT COURT FOR THE DISTRICT OF NEW JERSEY |
| Plaintiffs, | : : : | |
| v. | : : : | CIVIL ACTION NO. 98-2241(WGB) |
| STUDENT TRANSPORTATION OF AMERICA, INC., DENIS GALLAGHER, ROBERT H. BYRNE, JOHN REDDAN, JOHN EMBERSON, JOHN CAREY, PETER PEARSON AND THOMAS GALLAGHER, | : : : : : : : | HON. WILLIAM G. BASSLER  CERTIFICATION OF JAMES C. JOSLIN IN SUPPORT OF DEFENDANTS' EXHIBITS |
| Defendants. | : : | |

Dated: June 22, 1998

Thomas O. Kuhns
Brian D. Sieve
Ellen Therese Ahern
James C. Joslin
KIRKLAND & ELLIS
200 East Randolph Drive
Chicago, IL  60601
(312) 861-2000

Gerald A. Liloia
Michael R. O'Donnell
RIKER, DANZIG, SCHERER, HYLAND
 & PERRETTI, LLP
Headquarters Plaza
One Speedwell Avenue
Morristown, NJ  07962-1981
(973) 538-0800

Counsel for Defendants Student Transportation of
America, Inc., Denis Gallagher, Robert H. Byrne,
John Reddan, John Emberson, Peter Pearson and
Thomas Gallagher

CERT-4.MOT

I, JAMES C. JOSLIN, hereby certify as follows:

1.    I am an attorney licensed to practice in Illinois and an associate with the firm of Kirkland & Ellis, attorneys for defendants.

2.    I have personal knowledge of the facts set forth herein. I annex hereto:

    A.    Defendants' Exhibit A, a copy of the pending New Jersey Senate Bill 701.

    B.    Defendants' Exhibit B, the 12/16/97 Report on competition in the school bus transportation industry issued by the New Jersey Commission of Investigation.

    C.    Defendants' Exhibit C, a copy of the transcript from the 5/29/98 discovery hearing before Magistrate Judge Cavanaugh.

I certify under penalty of perjury that the foregoing facts are true.


_____
JAMES C. JOSLIN

DATED: June 22, 1998

Citation                     Search Result          Rank(R) 1 of 6          Database
1998 NJ S.B. 711 (SN)                                                        NJ-BILLS
1998 New Jersey Senate Bill No. 711, New Jersey 208th Legislature (FULL TEXT -
STATE NET)

NEW JERSEY BILL TEXT

First Reprint
SENATE, No. 711
STATE OF NEW JERSEY
208th LEGISLATURE
INTRODUCED FEBRUARY 23, 1998
Sponsored by:
Senator WILLIAM L. GORMLEY
Senator ROBERT J. MARTIN

Co-Sponsored by:
Senators Ciesla and Baer
As reported by the Senate Education Committee on May 14, 1998, with
amendments.
(Sponsorship Updated As Of: 4/28/1998)

VERSION: Amended
 May 14, 1998
Gormley

An Act concerning bidding on public school district transportation
contracts, amending N.J.S.18A:39-2, N.J.S.18A:39-3, and supplementing chapter
39 of Title 18A of the New Jersey Statutes.

TEXT:

Be It Enacted by the Senate and General Assembly of the State of New
Jersey:

1. (New section) The Legislature finds and declares that:

a. School transportation in New Jersey costs the taxpayers of the State
approximately $503,000,000 per year, of which $243,000,000 is provided in the
form of State aid;

b. The responsibility for obtaining transportation services and
establishing contracts with vendors rests with local school districts, with
only limited oversight by the Department of Education;

c. In many cases the local school district official handling pupil
transportation contracts has had insufficient training in this area and is
therefore ill-equipped to handle the responsibilities of the job;

d. The school bus industry in New Jersey has been vulnerable to abuse as
evidenced by criminal investigations and prosecutions over the past several
years;

e. Recently, seven school bus operators whose companies transport special

Copyright (C) 1998 Info. for Public Affairs

1998 NJ S.B. 711 (SN)

education and vocational students in Monmouth and Ocean counties were indicted for allegedly conspiring to rig bids to obtain more than $2 million in transportation contracts;

f. This type of collusive conduct eliminates true competition and increases the cost of school transportation for citizens, the school districts and the State;

g. It is therefore critical that changes to the school transportation contracting system be made in order to <<+ promote the existence of competitive conditions and to +>> eliminate the abuses within the system that drive up the cost of transportation services and thus increase the financial burden on the State's taxpayers to provide those services.

<<+ 2. (New section) As used in this act: +>>

<<+ "Affiliate" means: a. an associate business entity or organization engaging in a joint enterprise or common business with a person, but not identified with the person by complete common ownership including, but not limited to, a joint venture, joint venturer or limited partner; or b. a person directly or indirectly related to another person such that (1) one person controls or has the power to control the other person or (2) a third person controls or has the power to control both. +>>

<<+ "Commissioner" means the Commissioner of Education. +>>

<<+ "Key employee" means any employee or agent of a qualified person, or of a person applying to be a qualified person, who has or exercises management functions for, or on behalf of, the person or who has or exercises discretion regarding bidding, pricing or contracting activities of the person. +>>

<<+ "Person" means a natural person, corporation, partnership, proprietorship or other business entity or organization. +>>

<<+ "Qualified person" means any person qualified to be awarded a public school district transportation contract in accordance with the terms of this act. +>>

<<+ 3. (New section) Public school district transportation contracts and extensions of the contracts shall only be awarded to qualified persons. +>>

<<- 2. ->> <<+ 4. +>> (New section) a. The State Board of Education <<- and ->> <<+ , with the approval of +>> the Attorney General <<+ , +>> shall <<- jointly ->> <<+ promulgate rules and regulations to +>> establish procedures <<+ and standards +>> for the <<+ application and +>> qualification of persons <<- as prospective bidders on ->> <<+ to whom +>> public school district transportation contracts <<- . The procedures shall include a requirement that any person proposing to bid on a public school district transportation contract submit a prequalification form to the Commissioner of Education which shall include the following information: ->>

Copyright (C) 1998 Info. for Public Affairs

1998 NJ S.B. 711 (SN)

<<- (1) a certified, audited financial statement or compilation of financial statements; ->>

<<- (2) a statement as to organization of the prospective bidder which shall demonstrate the adequacy of the organization to provide school district transportation services; ->>

<<- (3) a statement as to prior experience, which shall indicate the number of years the prospective bidder has been engaged in the school transportation business; ->>

<<- (4) a statement as to past performance, which shall provide an accurate record of any school transportation work previously performed by the prospective bidder; ->>

<<- (5) a statement that all school transportation equipment meets the specifications of federal and State law and rules and regulations of the State Board of Education and that the prospective bidder complies with applicable law and rules and regulations governing pupil transportation; ->>

<<- (6) a certificate of liability insurance; ->>

<<- (7) affirmative action documents in accordance with P.L.1975, c.127(C. 10:5-31 et seq.); ->>

<<- (8) an affidavit of noncollusion; ->>

<<- (9) a statement as to bonding capacity; ->>

<<- (10) if the prospective bidder is a corporation or partnership, a statement setting forth the names and addresses of all stockholders or partners owning 5% or more interest in the corporation or partnership; and ->>

<<- (11) any other information required by the commissioner and the Attorney General ->> <<+ and extensions of the contracts may be awarded +>> .

b. <<+ The procedures and standards shall include, at a minimum, the following requirements: +>>

<<+ (1) a showing of the financial capacity and integrity of the applicant; +>>

<<+ (2) a showing of the applicant's experience or qualifications to engage in public school district transportation contracting including, without limitation, any history of prior disqualification or debarment from contracting for performance related reasons by any contracting or licensing authority; +>>

<<+ (3) a showing of the applicant's integrity and ethics to engage in public school district transportation contracting; and +>>

Copyright (C) 1998 Info. for Public Affairs

1998 NJ S.B. 711 (SN)

<<+ (4) the provision by the applicant of any other information required by the State Board of Education. +>>

<<+ c. (1) An applicant shall be deemed to have failed to meet the integrity and ethics standards mandated in this section if the applicant or any affiliate, current or former officer, director, key employee, owner or principal has been convicted within the past five years of a crime including, but not limited to, the criminal offenses listed in section 5 of P.L. ,c. (C. )(now pending before the Legislature as this bill) involving unfair or unethical business practices or acts of moral turpitude. +>>

<<+ (2) An applicant may be deemed to have failed to meet the integrity and ethics standards mandated in this section if the applicant, or any affiliate, officer, director, key employee, owner or principal: +>>

<<+ (a) has been held not responsible, denied a contract or denied approval as a subcontractor, vendor or material supplier by another contracting or licensing agency for reasons of integrity or for failure to cooperate with the agency's inquiries; +>>

<<+ (b) made material misrepresentations or false answers in response to questions arising out of the qualification process; or +>>

<<+ (c) has been debarred by any other contracting or licensing agency. +>>

<<+ As used in this section, a person is deemed to have been convicted of a crime if any judgment of guilt for a criminal offense has been entered against the person by a court of competent jurisdiction, whether by verdict or by plea of any sort or if that person has been admitted into a pretrial intervention program pursuant to N.J.S.2C:43- 12 or any similar law. +>>

<<+ d. Initial and renewal applications for qualification shall be filed with the commissioner on such forms as may be specified by rule or regulation. The commissioner may charge such reasonable fees for the applications as may be specified by rule or regulation. +>>

<<+ e. The commissioner shall notify the Attorney General within 10 days of the filing of all applications. The commissioner shall consider any recommendation made by the Attorney General with respect to any application. +>>

<<+ f. Within 90 days of receipt of a completed application for qualification or renewal of qualification, the commissioner, after consultation with the Attorney General, shall issue a written decision either approving the application, disapproving the application or, when an applicant is not qualified, approving the application subject to such conditions as are necessary to ensure that the applicant's performance as a qualified person will be consistent with the purposes of this act. The written decision shall advise the applicant of the right to a hearing on the decision if a request therefor is made within 10 days of the date of the decision. The determination

Copyright (C) 1998 Info. for Public Affairs

1998 NJ S.B. 711 (SN)

that an applicant is a qualified person shall expire, unless renewed, five
years after the date of the determination. If, at any time, a qualified person
knows that information contained in that person's application for
qualification has changed or is no longer correct, it shall be the duty of
that qualified person to notify the commissioner of the changed circumstances
in writing within 30 days after the date that the qualified person knows of
the change. +>>

  <<+ g. +>> The commissioner shall maintain a registry <<- of all
individuals and corporations ->> <<+ that identifies all +>> qualified <<- to
bid on public school district transportation contracts. The registry shall
include information on the qualification status of transportation vendors,
bonding capacity, insurance coverage, stockholder disclosure statement, if
appropriate, and any other information on vendors which a board of education
may require to evaluate prospective bids on school district transportation
contracts ->> <<+ persons +>> . The commissioner shall ensure that each school
district has access to the registry <<+ and that the registry contains all
non-confidential information relating to qualified persons. The commissioner,
by rule or regulation, may designate personally or commercially sensitive,
competitive information as confidential +>> .

  <<- 3. ->> <<+ 5. +>> (New section) <<- a. ->> The State Board of
Education <<+ , with the approval of the Attorney General, +>> shall <<+
promulgate rules and regulations that +>> provide for the <<- permanent ->>
debarment from bidding on any public school district transportation contract
<<+ or extension of contract +>> of a <<+ qualified +>> person who has:

  <<- (1) engaged ->> <<+ a. been convicted of engaging +>> in collusion <<-
, ->> <<+ or +>> bid rigging <<- or any other ->> <<+ in +>> violation of the
federal or State antitrust statutes <<- . Evidence of having engaged in these
activities shall be established upon the rendering of a final judgment or
conviction including a guilty plea or a plea of nolo contendere by a court of
competent jurisdiction ->> ; or

  <<- (2) committed ->> <<+ b. been convicted of +>> a criminal offense as
an incident to obtaining or attempting to obtain a public or private contract,
or subcontract thereunder, or in the performance of such contract or
subcontract. <<- Evidence of having committed these offenses shall be
established upon the rendering of a final judgment or conviction including a
guilty plea or a plea of nolo contendere by a court of competent jurisdiction.
->>

  <<- b. The Commissioner of Education shall keep and maintain a list of all
individuals and corporations barred from bidding on any public school district
transportation contract pursuant to this section. ->>

  <<- c. For the purposes of this section a person is an individual
convicted of any of the above offenses and any business, including any
corporation, partnership, association or proprietorship in which such
individual is a principal, or with respect to which the individual owns,
directly or indirectly, or controls 5% or more, of the stock or other equity

Copyright (C) 1998 Info. for Public Affairs

1998 NJ S.B. 711 (SN)

interest of such business. ->>

    <<+ As used in this section, a person is deemed to have been convicted of a crime if any judgment of guilt for a criminal offense has been entered against the person by a court of competent jurisdiction, whether by verdict or by plea of any sort or if that person has been admitted into a pretrial intervention program similar to that created by N.J.S.2C:43-12 for such offenses. +>>

    <<+ 6. (New section) a. Debarment under the terms of this section shall be permanent unless the commissioner, in consultation with the Attorney General, determines that permanent debarment is not in the public interest; provided that the commissioner may, in appropriate circumstances, allow a qualified person who is otherwise subject to debarment to continue to be a qualified person subject to such conditions as may be deemed necessary to ensure that the qualified person's future performance will be consistent with the purposes of this act. The commissioner shall debar unless the qualified person has demonstrated by clear and convincing evidence that it has taken actions sufficient to remedy the prior violation and to ensure that the violation will not recur. +>>

    <<+ b. Debarment may include all known affiliates of a person, provided that the commissioner makes each decision to include an affiliate on a case-by-case basis after giving due regard to all relevant facts and circumstances. The offense of a person may be imputed to another person when such conduct was accomplished within the course of the person's duties for another person or was effectuated by the person with the knowledge, assistance or approval of another person. +>>

    <<+ c. A decision to debar or to withhold debarment subject to specified conditions shall be made in writing by the commissioner, and a copy thereof shall be mailed to each person affected by the decision. The written decision shall also advise the recipient of the right to a hearing on the decision if a request therefor is made within ten days of the date of the decision. +>>

    <<+ d. The commissioner shall keep and maintain a list of all persons barred from being awarded public school district transportation contracts and extensions of contracts pursuant to this section. +>>

    <<- 4. ->> <<+ 7. +>> (New section) The Attorney General or a county prosecutor who obtains a conviction for a crime enumerated in <<- subsection a. of ->> section <<- 3 ->> <<+ 5 +>> of P.L. ,c. (C. )(now pending before the Legislature as this bill) shall provide the Commissioner of Education with a copy of the judgment of conviction and shall thereafter notify the commissioner if any such conviction is reversed.

    <<- 5. (New section) The State Board of Education shall furnish to a person it seeks to debar pursuant to section 3 of this act, a written notice of the proposed debarment, the alleged cause for debarment and notice that the person has a right to a hearing prior to debarment, provided a hearing is requested in writing within 10 days of receipt of the written notice. Prior to

Copyright (C) 1998 Info. for Public Affairs

1998 NJ S.B. 711 (SN)

debarment of any person who submits a request for a hearing within 10 days of
receipt of the notice, a hearing shall be held and conducted as a contested
case pursuant to the "Administrative Procedure Act," P.L.1968, c.410
(C.52:14B-1 et seq.). ->>

    <<- 6. ->> <<+ 8. +>> (New section) If an appeal taken from a <<- judgment
or ->> conviction upon which a debarment is based pursuant to section <<- 3
->> <<+ 5 +>> of this act results in a reversal of the <<- judgment or ->>
conviction, <<- the ->> <<+ a +>> debarment pursuant to section <<- 3 ->> <<+
5 +>> of this act <<+ founded solely upon the conviction +>> shall be removed
upon the request of the debarred person.

    <<- 7. ->> <<+ 9. +>> (New section) a. A <<+ qualified +>> person may be
suspended by the <<- State Board of Education ->> <<+ commissioner +>> and
thereby excluded from <<- participating in ->> <<+ being awarded +>> any <<+
prospective +>> public school district transportation contracts <<- pending
initiation and final determination of a debarment proceeding ->> <<+ or
extensions of the contracts +>> if <<- : ->>

    <<- (1) the Commissioner of Education and the Attorney General find that
there is reasonable cause to believe that a person is subject to debarment
pursuant section 3 of this act and that the public interest requires the
immediate exclusion of the person from public school district transportation
contracting pending debarment; and ->>

    <<- (2) the State Board of Education provides the person with a written
notice: stating that a suspension has been imposed and its effective date;
setting forth the reasons for the suspension to the extent that the State
Board of Education determines that such reasons may be properly disclosed;
that the suspension is for a temporary period pending the completion of an
investigation and such legal proceedings as may ensue; and indicating that, if
legal proceedings are not commenced or the suspension removed within 60 days
of the date of the notice, the person will be given either a statement of the
reasons for the suspension and an opportunity for a contested case hearing
conducted in accordance with the "Administrative Procedure Act," P.L.1968,
c.410 (C.52:14B-1 et seq.), if a hearing is requested, or a statement
declining to give such reasons and setting forth the State board's position
regarding the continuation of the suspension. ->>

    <<- b. A suspension shall not continue beyond 18 months from its effective
date, unless civil or criminal action regarding the alleged violation shall
have been initiated within that period, or unless debarment action has been
commenced. Whenever prosecution or debarment action has been initiated, the
suspension may continue until the legal proceedings are completed. ->>

    <<- c. ->> <<+ that person has been indicted for the commission of any
offense which, in the event of a conviction, would subject the person to
debarment pursuant to section 5 of P.L. ,c. (C. )(now pending before the
Legislature as this bill). As an alternative to suspension, the commissioner
may allow, if the public interest requires, a qualified person to continue as
a qualified person subject to such conditions necessary to ensure that the

Copyright (C) 1998 Info. for Public Affairs

1998 NJ S.B. 711 (SN)

qualified person's future performance will be consistent with the purposes of
this act. The power to withhold suspension subject to conditions shall only be
exercised when the qualified person has demonstrated by clear and convincing
evidence that the person has taken actions sufficient to remedy the
allegations of the indictment, whether true or not, and to ensure that the
conduct alleged in the indictment will not recur during the pendency of the
criminal case. Each qualified person who is suspended or permitted to continue
as a qualified person subject to conditions pursuant to the terms of this
section shall be notified of the fact of, and the basis for, such a suspension
or decision in writing. The written notice shall advise the qualified or
suspended person of the person's right to a hearing on the suspension or
decision if a request therefor is made within 10 days of the date of that
notice. +>>

   <<+ b. +>> A suspension may include all known affiliates of a person,
provided that each decision to include an affiliate is made on a case-by-case
basis after <<- given ->> <<+ giving +>> due regard to all relevant facts and
circumstances. The offense of <<- an individual ->> <<+ a person +>> may be
imputed to <<- a ->> <<+ another +>> person <<- with whom the individual is
affiliated, where ->> <<+ when +>> such conduct <<- was ->> <<+ is alleged to
have been +>> accomplished within the course of the <<- individual's official
duty ->> <<+ person's duties for another person +>> or was effectuated by the
<<- individual ->> <<+ person +>> with the knowledge <<+ , assistance +>> or
approval of <<- such ->> <<+ another +>> person.

   <<+ 10. (New section) A decision by the commissioner pursuant to P.L. ,c.
(C. )(now pending before the Legislature as this bill) shall be a final agency
decision appealable to the Superior Court in an action in lieu of perogative
writ. +>>

   <<- 8. ->> <<+ 11. +>> (New section) Each county superintendent shall
conduct a study of the potential cost savings that could be realized through
intergovernmental agreements for the provision of pupil transportation
services entered into pursuant to the provisions of the "Interlocal Services
Act," P.L.1973, c.208 (C.40:8A-1 et seq.), or joint transportation contracts
established pursuant to N.J.S. 18A:39- 11. The county superintendent shall
study various types of possible intergovernmental agreements and contracts
including one that would encompass all school districts in the county and
others that would involve combinations of school districts within the county,
as he deems appropriate. The results of the study shall be provided to the
Legislature and the Governor no later than one year from the effective date of
this act.

   <<- 9. ->> <<+ 12. +>> N.J.S.18A:39-2 is amended to read as follows:

   18A:39-2. Any board of education having power to provide for the
transportation of school pupils in its district to and from school may provide
such transportation by a bus or buses owned by it or may enter into contract
for such transportation, approved by the county superintendent <<- , for a
term not exceeding 4 years ->> <<+ , for a term not exceeding 4 years +>> .
<<- The Department of Education may require a board of education to contract

Copyright (C) 1998 Info. for Public Affairs

1998 NJ S.B. 711 (SN)

for such transportation for a one-year term or for multiple year terms, depending on which method the department determines is the most efficient and reasonable. ->>

All multi year contracts made pursuant to the above taking effect subsequent to September 1, 1975 may, at the discretion of the local board of education, and subject to approval by the county superintendent, be increased not to exceed 7 1/2 annually of the original yearly contract cost beginning with the second year of the contract. <<+ Any multi-year bid proposal submitted to a board of education shall include a separate cost for each year of the proposed contract and shall detail the reasons for any increase in cost which is projected to occur from one year of the proposed contract to the next year during the term of the contract. +>>
(cf: P.L.1982, c.74, s.2)

<<- 10. ->> <<+ 13. +>> N.J.S.18A:39-3 is amended to read as follows:

18A:39-3. a. No contract for the transportation of pupils to and from school shall be made, when the amount to be paid during the school year for such transportation shall exceed $7,500.00 or the amount determined pursuant to subsection b. of this section, and have the approval of the county superintendent of schools, unless the board of education making such contract shall have first publicly advertised for bids therefor in a newspaper published in the district or, if no newspaper is published therein, in a newspaper circulating in the district, once, at least 10 days prior to the date fixed for receiving proposals for such transportation, and shall have awarded the contract to the lowest responsible bidder.

Nothing in this chapter shall require the advertisement and letting on proposals or bids of annual extensions, approved by the county superintendent, of any contract for transportation entered into through competitive bidding when--

(1) Such annual extensions impose no additional cost upon the board of education, regardless of the fact that the route description has changed; or

(2) The increase in the original contractual amount as a result of such extensions does not exceed <<- 30% thereof ->> <<+ the rise in the Consumer Price Index for all urban consumers in the New York City and Philadelphia areas as reported by the United States Department of Labor +>> , regardless of the fact that the route description has changed or an aide has been added or removed <<+ , except that for a board of education that is ranked in the lowest fifth percentile as to regular vehicle capacity utilization as determined by the Department of Education pursuant to section 25 of P.L.1996, c.138 (C.18A:7F-25), the advertisement and letting on proposals or bids of extensions shall continue to be required +>> ; or

(3) (Deleted by amendment, P.L.1982, c.74.)

(4) The increase in the original contractual amount as a result of an extension exceeds <<- 30% thereof ->> <<+ the rise in the Consumer Price Index

Copyright (C) 1998 Info. for Public Affairs

1998 NJ S.B. 711 (SN)

for all urban consumers in the New York City and Philadelphia areas as reported by the United States Department of Labor +>> , but the following apply to the extensions:

(a) The increase is directly attributable to a route change to accommodate new student riders or safety concerns; and

(b) The school destination remains unchanged from the original contract.

Any such extension as described in this paragraph shall be approved by the county superintendent of schools and shall be bid for the next school year.

Nothing in this chapter shall require the immediate bid of any contract renewal for the remainder of a school year in which the only change, in addition to route description, is the bus type. However, any such extension shall be approved by the county superintendent of schools and shall be bid for the next school year.

b. The Governor, in consultation with the Department of the Treasury, shall, no later than March 1 of each odd-numbered year, adjust the threshold amount set forth in subsection a. of this section, or subsequent to 1985 the threshold amount resulting from any adjustment under this subsection or section 17 of P.L.1985. c.469, in direct proportion to the rise or fall of the Consumer Price Index for all urban consumers in the New York City and the Philadelphia areas as reported by the United States Department of Labor. The Governor shall, no later than June 1 of each odd-numbered year, notify all local school districts of the adjustment. The adjustment shall become effective on July 1 of each odd-numbered year.
(cf: P.L.1991, c.316, s.1)

<<+ 14. (New section) Within 180 days following the effective date of this act, the State Board of Education, with the approval of the Attorney General, shall adopt rules and regulations pursuant to the "Administrative Procedure Act," P.L.1968, c.410 (C.52:14B-1 et seq.) which are necessary to effectuate the provisions of this act. +>>

<<+ 15. (New section) This act shall be liberally construed to effectuate its remedial purposes. +>>

<<+ 16. If any portion or provision of this act shall be declared to be unconstitutional, invalid or inoperative, in whole or in part, by a court of competent jurisdiction, this act, to the extent that it is not unconstitutional, invalid or inoperative, shall be enforced and effectuated, and no such determination shall be deemed to invalidate or make ineffectual the remaining provisions of this act. +>>

<<- 11. ->> <<+ 17. +>> This act shall take effect immediately <<+ ; provided that the commissioner is authorized to determine the extent to which the requirements of sections 3 and 4 of this act shall apply to the award of public school transportation contracts pending the adoption of regulations and standards required by this act +>> .

Copyright (C) 1998 Info. for Public Affairs

1998 NJ S.B. 711 (SN)

1998 NJ S.B. 711 (SN)
END OF DOCUMENT

Copyright (C) 1998 Info. for Public Affairs

DEC **16** 1997



## *State of New Jersey*
## *Commission of Investigation*

**Tuesday, Dec. 16, 1997**

## NEWS ADVISORY

The State Commission of Investigation today issued the attached letter detailing the findings and recommendations stemming from its investigation of New Jersey's school transportation industry.

**Contact: Lee Seglem**
        **SCI**
        **609-292-6767**



### State of New Jersey
#### COMMISSION OF INVESTIGATION
28 WEST STATE STREET
CN 045
TRENTON NJ 08625-0045
TEL (609) 292-6767
FAX (609) 633-7366

ESLIE Z. CELENTANO
*Chair*

I. KAREN THOMPSON
W. CARY EDWARDS
*Commissioners*

JAMES J. MORLEY
*Executive Director*
ROBERT J. CLARK
*Deputy Director*
HELEN K. GARDINER
*Assistant Director*
LEE C. SEGLEM
*Executive Assistant*
CHARLOTTE K. GAAL
ILEANA N. SAROS
*Counsel*

December 16, 1997

Hon. Gordon A. MacInnes
Senator, District 25
21 Bloomfield Avenue
Denville, NJ  07834

Dear Senator MacInnes:

In a letter dated September 10, 1996, you asked the Commission to examine certain critical issues involving New Jersey's school transportation industry. The request centered on allegations that the industry has been subverted by unscrupulous busing contractors who have engaged in a variety of improper acts, including collusion, bid rigging and fraud.

On October 23, 1996, the Commission, pursuant to statutory requirements, adopted a resolution authorizing an investigation into "whether, and to what extent, competition or integrity in the school transportation industry and related enterprises has been adversely affected by deficiencies or wrongdoing in public purchasing or contracting, by undue restraints or impediments to the operation of the free market system, or by corruption or improper influence involving public officers or employees."

This document recounts the background, findings and recommendations stemming from that investigation.

## Background

School transportation in New Jersey is a major industry in which approximately 300 private bus companies serving 585 school districts transport nearly 672,000 students to and from school each day.  The total cost to taxpayers is $503,000,000 per year, of which $243,000,000 is provided in the form of state aid.

Responsibility for engaging transportation services and establishing contracts with qualified vendors rests with local school districts.  The State Department of Education (DOE) provides only limited oversight.  Under the current system, each district must provide copies of contracts with successful bidders, as well as all relevant board of education minutes, to the office of the appropriate county school superintendent.  Acting on behalf of the state, this office then reviews the materials to see that basic requirements, such as provision of adequate insurance, are fulfilled.  No review of specific bids is conducted, although DOE is considering extending the county superintendents' duties to include this task.

New Jersey's school-busing industry is and has been vulnerable to abuse, as evidenced by criminal investigations and prosecutions in recent years.  Between 1986 and 1989, the United States Attorney's Office for New Jersey and the State Division of Criminal Justice (DCJ) successfully prosecuted a series of cases involving corrupted transportation programs in school districts in Union and Middlesex counties.  That probe, recounted in the 1992 SCI report, "Local Government Corruption," resulted in at least 15 convictions against busing contractors and school district officials charged with bribery, bid rigging and fraud.  In August 1997, DCJ, assisted by the Monmouth County Prosecutor's Office, initiated a separate investigation into questionable bids on school transportation routes for special education students in Monmouth County.  On September 23, the Attorney General's Office announced the arrests of seven school-bus operators on charges of conspiring to obtain approximately $2 million worth of school-bus contracts through collusive bidding on transportation routes for special-needs students in both Monmouth and Ocean counties.

The Commission's investigation consisted of gathering information concerning the school-busing industry and pursuing leads, particularly as they related to allegations of collusion and bid rigging.  To those ends, Commission

2

staff contacted the offices of the state's 21 county prosecutors, DCJ and the U.S. Attorney's Office for information relevant to any cases or complaints concerning school-bus transportation in New Jersey over the past five years.  Extensive interviews were conducted with owners and principals of bus companies, school district transportation coordinators, county superintendents, representatives of special service districts, officials of DOE and the New Jersey School Boards Association, and members of the general public.  Commission staff also reviewed extensive corporate records for numerous private bus companies.

*Findings*

- Conditions which foster and permit collusive bidding and related abuses are prevalent throughout New Jersey's school transportation system. Commission staff was told that collusion is "built-in," reflective of the fact that bus company owners routinely refuse to submit bids in districts where others already are operating.  It is understood within the industry that some form of retaliation will result if this informal system of customer allocation is violated.

- Trends in pupil transportation in New Jersey reflect the appearance and growing dominance of large, multi-state bus companies that are both under-bidding and buying out smaller competitors.  These large companies often are the only entities capable of providing service to larger school districts through bulk bids, which require a company to serve all of a district's routes.

- Many school district transportation programs involve vendors selected through an extremely narrow bidding process.  Many district transportation coordinators told Commission staff that, despite efforts to solicit bids, they often receive no more than a few or only one.  On the other hand, the Commission found instances where only select vendors were solicited for informal quotes, rather than all of those located within reasonable proximity to the bus routes.  Lacking comparative data, district officials are unable to determine the reasonableness of single bids. One school district reported having had a single bidder for the last 35 years.  Another has engaged a solitary bidder for the past 27 years.  In some instances, special arrangements were noted

between bus companies and school districts or municipalities which favored the successful vendor over would-be competitors. In an effort to encourage competition, one local official actively solicited bids from prospective transportation vendors within a 50-mile radius only to receive a single bid — from the district's longtime lone bidder.

- **Insufficient training is provided to local district officials responsible for handling transportation contracts.** As a result, many transportation coordinators are ill-equipped to handle the responsibilities of their jobs.

- **Poor record keeping by some school districts and special services transportation offices has contributed to lax oversight.** There are no enforcement procedures for lack of record keeping compliance, and the offices of county superintendents, in general, provide little or no independent review of the bid process.

- **Costs have been driven up in some instances by the failure of local district officials to take advantage of obvious economies in transportation arrangements.** For example, a busing program in one school district was awarded on a bulk basis, rather than a per-route basis. The latter would have resulted in savings of more than $1 million in just the first year of the contract.

- **Violations of the state's Administrative Code and applicable statutes were noted.** A DOE audit of one district, for example, revealed numerous violations, including the awarding of contracts for nonpublic transportation in amounts that exceeded what is allowed for aid-in-lieu-of-transportation payments; the awarding of "temporary" routes for periods longer than the allowable 90 days, and in amounts in excess of the bid threshold; the cancellation of routes that later were reinstated without competitive bidding; the awarding of temporary routes without solicitation of bids; and the separate awarding of contracts on a "to-and-from" basis rather than "round trip."

**Recommendations**

The Commission makes the following recommendations for consideration as part of an overall effort to provide an environment that fosters competition, minimizes costs and reduces the likelihood of collusion:

## 1. Regionalize Pupil Transportation

New efforts under the direct supervision of DOE should be undertaken to regionalize pupil transportation. Legislation enacted during the Commission's investigation, commonly known as the *Regionalized Public Transportation Services Act, Laws of 1997, Chapter 53,* provides an initial framework for regionalizing transportation of county vocational and special education pupils. The law calls for identification of agencies that supply cooperative transportation services, such as local boards of education, educational services commissions and county special services school districts. School districts responsible for transportation of county vocational pupils or special education pupils must utilize one of the identified agencies unless the district can provide the transportation at a lower cost or to do so would violate policies of the resident school district. The law also provides for exploration of cost-saving alternatives to payment in lieu of transportation of nonpublic school pupils. Finally, the legislation directs the Commissioner of Education to report to the Governor and the Legislature within three years concerning the bill's effectiveness in promoting a regionalized transportation service and the advisability of expanding regionalized transportation services to other students. The Commission endorses this requirement.

The following additional considerations should be incorporated in any regionalization effort:

- Artificial boundaries, such as county lines, should not be used to determine regionalized busing areas. Multiple transportation regions, for example, might serve a single county. In other instances, more than one county should coordinate pupil busing in a single regionalized network.

- The state's DOENET computer system should be utilized as a computerized routing system to assist in coordinating routes among school districts.

## 2.   Tiering and Consolidation of Busing

Maximum advantage should be taken of tiering of bus routes, flexible school opening/closing times and coordinated calendars and schedules of public and nonpublic schools. Further, consolidation and streamlining of extracurricular, athletic and other special transportation needs should be undertaken. Methods include combining sports teams or separate groups on one bus and utilizing small vans where practicable.

## 3.   Improve Overall Quality of Transportation Coordinators

High priority should be given to the selection of qualified individuals to serve as transportation coordinators. The DOE should establish minimum qualifying standards for these positions.  The Pupil Transportation Supervisor Program, sponsored by the DOE, should be expanded and required of all transportation coordinators to enhance their skills, provide them with tools necessary to perform their jobs effectively and efficiently, and prepare them in advance for changes in the industry.

## 4.   Improve the Bid Process

A number of bidding issues that directly, yet independently, impact the cost of pupil transportation should be addressed in conjunction with regionalization and upgrading the position of transportation coordinator:

- A pre-qualification process utilizing a model administered by the DOE should streamline bid proposals. Establishment of a central repository of duplicative parts of bid proposals (proof of insurance, bonding, and ownership) should cut costs and improve efficiency. Uniform statewide manuals for such requirements as accident procedures and insurance should be established. A statewide method of pricing bids should be developed to aid in price comparisons and to provide uniformity in proposals. Utilizing different pricing structures, such as per diem and annual pricing, only obfuscates cost analysis.

- Rules and regulations should be uniform and consistently enforced. Unreasonable or excessive

fines and penalty practices impact the bidding process because vendors factor those costs into their bids.

- Every effort should be made to build more time into both the bidding and the implementation processes to foster competition and competitive prices. The Commission found instances where insufficient time was provided to prepare bids and implement contracts. It was not unusual for bid requests to be issued in August for transportation routes to be provided in September. In many instances, routes could have been released for bid in June, allowing bus companies additional time to secure buses, drivers and facilities to perform the contracts. Therefore, the contracting entity should (1) solicit bids with as early a return date as possible, and (2) award the contract to allow as much time as possible between the award and implementation of the contract.  Any additional effort regarding classification and designation of special education and special needs students to complete this process in a timely manner should be expended to allow bids to be advertised and contract to be awarded as quickly as possible.

- Vendors should be paid within a reasonable amount of time (45 days or less) to prevent inflation of bid prices to compensate for slow payment practices.

- Cost-of-living increases should serve to contain costs better than the 30% cap on increases above the original contractual agreement currently in place on renewed contracts. Instances were noted where, upon renewal, contracts reached the 30% increase rapidly and then were continually renewed for many years without an increase, thus suggesting the awards and early increases were inflated.

- Where applicable, the process of obtaining quotes should not be used to parcel out work to favored vendors. All bus companies within a reasonable distance should be contacted to submit quotes.

- Awarding transportation contracts for multiple years, rather than bidding on an annual basis, should be pursued. A vendor may be more likely to bid and to submit a competitive price if the contract will be in place for several years since considerable costs and investment may be involved.

7

It is difficult for bus companies to base business plans on one-year contracts. Absent a secure return for his investment, a bidder may decline to bid. Moreover, financial institutions may be reluctant to extend credit to businesses whose ability to repay loans may be hampered by short-term contracts where competition is being encouraged.

- In order to foster competition and to minimize conditions that breed collusion, routes should be bid in packages that may be performed efficiently. "All-or-none" proposals tend to limit competition to only the largest bidders. Smaller companies may not have the resources available to meet an entire district's transportation needs.

## 5. Debarments

A number of individuals who were the subjects of earlier law enforcement probes remain in the school transportation business in New Jersey, and the Commission is concerned that their continued presence may serve to undermine the integrity of the industry as a whole. Exclusion of potential bidders or contractors to satisfy integrity and performance concerns presently involves a convoluted system governed by a state executive order, criminal statutes and local policies.  In its September 1992 report, "Local Government Corruption", the Commission recommended the creation of a comprehensive, well-enforced system of debarments, suspensions and disqualifications. Under this proposal, which the Commission reiterates here, individuals or companies that have violated standards of integrity or performance would be barred from publicly funded pupil transportation jobs.

## 6. Maintenance of a Fleet of Publicly Operated Buses

Vendors may submit more reasonably priced bids if districts or regions possess some measure of publicly owned transportation. Bidders will be aware that they are not the only option. Moreover, the contracting entity will have more information as to repair costs, etc. Maintaining an in-house fleet might also result in the negotiation of concessions from bus drivers, thus providing for an alternate, cost-effective means of transportation supplied by the contracting entity itself.  Such an alternative would be particularly helpful in a regionalized approach because the publicly operated transportation service may well be able to

provide a competitive alternative to single or excessive bids.

## 7. Subscription Busing

Where appropriate, consideration should be given to the offering of subscription busing at an annual fee to those students who live less than the minimum distance from schools for which school districts are required to provide transportation. This practice should maximize the efficient use of buses, provide a safe means of transporting the pupils to school, and provide revenues to offset overall transportation costs.

Very truly yours,

LESLIE Z. CELENTANO
Chair

M. KAREN THOMPSON
Commissioner

W. CARY EDWARDS
Commissioner

cc: Hon. Christine Todd Whitman
Hon. Donald T. DiFrancesco
Hon. Jack Collins

9

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

LAIDLAW, INC.,

       : Civil Action No. 98-2241(WGB)

    Plaintiff, :

       : Newark, New Jersey

   vs.    :

       :

STUDENT TRANSPORTATION OF:
AMERICA, INC., et al, :

    Defendants. : Friday, May 29, 1998
- - - - - - - - - - - - - - - - - - - - - - - - -

TRANSCRIPT OF DISCOVERY MOTIONS
BEFORE THE HONORABLE DENNIS M. CAVANAUGH, U.S.D.J.

APPEARANCES:

FOR THE PLAINTIFF:  BY:  WILLIAM LEONARD, ESQ.
         (Obermayer, Rebmann, Maxwell &
           Hippel)
         1617 John F. Kennedy Boulevard
         One Penn Center, 19th Floor
         Philadelphia, PA 19103


FOR THE DEFENDANT:  BY:  MICHAEL O'DONNELL, ESQ.,
         (Riker, Danzig, Scherer, Hyland &
           Perretti)
         One Speedwell Avenue
         Morristown, NJ 07962

         BY:  BRIAN SIEVE, ESQ.,
         (Kirkland & Ellis)
         200 East Randolph Drive
         Chicago, IL 60601


Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

***************************************************************
RAPID TRANSCRIPT SERVICE, INC.
4 Elodie Lane
Randolph, New Jersey 07869
(973) 328-1730   FAX (973) 328-8016
***************************************************************

Provided by Michele Vicaro

1    did was, we served discovery tailored to those issues. And the
2    first thing we asked for that we haven't received from Laidlaw
3    are documents concerning the public interest prong and the
4    competition prong. We've got testimony that we're going to be
5    submitting on June 24th before Judge Bassler on that issue of
6    competition; that is, we've got testimony from school -- from
7    employees and officials in New Jersey School Districts that are
8    going to testify either by affidavit or live that our client's
9    involvement in the schoolbus industry has increased competition
10   and, in fact, has lowered the overall schoolbus cost. And New
11   Jersey, as Your Honor may know, is reported to have the
12   highest schoolbus transportation costs in the nation.
13          THE COURT: New Jersey has the highest everything.
14          MR. SIEVE: So our client is promoting competition
15   and is lowering those costs. So we served discovery on that.
16          Now one of the things that is very much at issue here
17   is the fact that there has been -- there have been indictments
18   and civil charges brought against a number of companies
19   including Laidlaw for bid-rigging and collusion in the
20   schoolbus transportation industry. And Laidlaw itself, not
21   just its employees, but the company Laidlaw has been indicted
22   and the State Attorney General's brought civil charges against
23   Laidlaw .
24          THE COURT: Okay. This is the part of the issue that
25   came up in our telephone conversation.

— 6 —

1          MR. SIEVE: Correct, Your Honor.
2          THE COURT: And my question was: In general, those
3   types of offenses or those types of incidents that occur are
4   public. Indictments usually aren't sealed, it's well-known,
5   and the information, unless there's an ongoing investigation.
6   I assume this is over with.
7          MR. SIEVE: I don't know, Your Honor. That's one of
8   the things we asked in our interrogatory; which is, is the
9   indictment -- is the action over with. They refused to answer
10   that. So I don't know the status of that investigation. I do
11   know that it has been publicly reported. In fact, they issued
12   a press release announcing that they had been indicted and that
13   there had been civil charges brought against them and that they
14   were defending that. I asked them in an interrogatory, is it
15   resolved; if so, what was the resolution. They refused to
16   answer.
17          THE COURT: Which is the interrogatory you're
18   referring to?
19          MR. SIEVE: That's Interrogatory No. 15, Your Honor,
20   in my --
21          THE COURT: That's under which exhibit?
22          MR. SIEVE: It's defendant's Student Transportation
23   of America's document request.
24          Part of the problem, Your Honor, is that Laidlaw did
25   not copy our document request.

— 7 —

1          MR. O'DONNELL: Exhibit C.
2          MR. SIEVE: Exhibit C. I'm sorry.
3          THE COURT: Exhibit C. Number what?
4          MR. SIEVE: I'm sorry. That's the document request.
5   Let me get the interrogatory, Your Honor.
6          THE COURT: First set of interrogatories, Exhibit B?
7          MR. SIEVE: Yes, Your Honor. Number 15.
8          THE COURT: Counsel, do you have those in front of
9   you also?
10          MR. LEONARD: Well, Your Honor, they weren't provided
11   to me in that order, so I don't have exhibit numbers. I'm
12   trying to --
13          THE COURT: Well, okay. Well, you have a copy of the
14   interrogatories that were served.
15          MR. LEONARD: I do.
16          THE COURT: Okay. You need a second to find it?
17          MR. LEONARD: I think I'm generally familiar with it.
18   I'll keep looking as we continue, Your Honor.
19          THE COURT: Okay. Well, let me just look here.
20   Number 15, which basically says: "Are the criminal and civil
21   actions filed by the New Jersey State Attorney against Laidlaw
22   Transit, Inc. in January 1998 still pending? If not, explain
23   how each of these matters was resolved, and, if settled, the
24   terms and amount of any settlement."
25          Okay. Now that's the question, and what was the

— 8 —

1   response?
2          MR. SIEVE: It was an objection. They didn't
3   respond, Your Honor. The objection, which is Exhibit C that
4   Your Honor has, I believe. No, I'm sorry. Exhibit D. They
5   just object that it's overly broad, unduly burdensome, and
6   irrelevant.
7          THE COURT: Okay. Why is it overly broad, why is it
8   unduly burdensome, and why is it irrelevant?
9          MR. LEONARD: Your Honor, it is our position --
10          THE COURT: First of all, it can't be unduly
11   burdensome.
12          MR. LEONARD: No, Your Honor. It --
13          THE COURT: Well, why would you object under those
14   standards?
15          MR. LEONARD: Our position is that it's irrelevant,
16   Your Honor.
17          THE COURT: Okay. But why would we bring up the
18   others -- if it's irrelevant, just say it's irrelevant. Why
19   are we using these other terms?
20          MR. LEONARD: Your Honor --
21          THE COURT: So you're abandoning any other objection
22   other than relevancy?
23          MR. LEONARD: That's correct, Your Honor.
24          THE COURT: Okay. Tell me why it's irrelevant.
25          MR. LEONARD: Your Honor, this case involves the

— 9 —

Provided by Michele Vicaro

**[Page 10]**

1   enforcement of a covenant not to compete in the sale of a
2   business. That's important Mr. Sieve acknowledged that. It's
3   important because, under New Jersey law, covenants that are
4   negotiated and executed in the sale of a business are freely
5   enforced, in contrast to covenants in employment contracts,
6   which are carefully scrutinized.
7           The reason for the difference, Your Honor, is that
8   the Courts recognize that in the context of a sale of a
9   business, the parties have equal bargaining power and they're
10  free to negotiate whatever terms they may have at --
11          THE COURT: Well, let's get right to the point. I'm
12  talking about the information sought here. Is this somehow
13  privileged or confidential, or is it public information?
14          MR. LEONARD: Your Honor, the answer is that the
15  matter's still pending.
16          THE COURT: Okay. But why didn't you just say
17  that?
18          MR. LEONARD: Well, because we think the entire
19  matter of the indictment is irrelevant to this case and
20  shouldn't be a matter for discovery at all. And we think it
21  reflects an intent to bring before the Court extraneous matter
22  that has nothing to do --
23          THE COURT: Okay. The question has just been
24  answered then, as I understand it, that it is still pending.
25  Is that it?

─── 10 ───

**[Page 11]**

1           MR. LEONARD: Yes.
2           THE COURT: Okay. Next.
3           MR. SIEVE: Well, Your Honor, there are a number of
4   documents, as you point out, some of which are publicly
5   available pertaining to this bid-rigging allegation in this
6   indictment.
7           THE COURT: Well, why is this whole issue of their
8   criminal conduct relevant in the case before Judge Bassler?
9           MR. SIEVE: Because --
10          MR. LEONARD: May I address that first, Your Honor?
11          THE COURT: Sure.
12          MR. LEONARD: Okay.
13          THE COURT: Well, I guess you're going to address why
14  it is not relevant.
15          MR. LEONARD: Well, this case -- yes, Your Honor.
16  This case is a case about the enforcement of these covenants
17  not to compete. If you look at Exhibits A and B to the
18  complaint, those are the covenants that were attached --
19          THE COURT: Exhibits A and B to the complaint? I
20  don't have the complaint in front of me. Did you give me
21  it? This, since it was an order to show cause seeking
22  injunctive relief everything went to Judge Bassler. So I don't
23  have the -- the only file that I have is that which really you
24  guys have sent me and an order for --
25          MR. LEONARD: Judge, if I may hand up --

─── 11 ───

**[Page 12]**

1           THE COURT: -- pro hac vice.
2           MR. LEONARD: If I may hand up, I have a set of the
3   exhibits to the complaint. I don't have the complaint, but I
4   have a set of exhibits.
5           THE COURT: Okay. Go ahead.
6           MR. LEONARD: If you look at Page 2 of Exhibit A, and
7   it's Page 2 of Exhibit B as well because they're identical
8   documents. These are the documents that Denis Gallagher and
9   his father Thomas Gallagher signed when they sold their
10  business to Laidlaw.
11          It's interesting, Your Honor, that at that time the
12  company Laidlaw was known as Travelways, Inc., and that is the
13  name that the Gallaghers are now using as one of the companies
14  that they are competing against Laidlaw with.
15          But in that covenant, at Paragraph 1A, you'll see the
16  provision for noncompetition in New Jersey. Denis and Thomas
17  Gallagher, Judge, were each paid one million dollars apiece for
18  signing covenants not to compete. They put that money in their
19  pocket and they're now contending, having walked away with that
20  one million dollars apiece, that these agreements are somehow
21  unenforceable because they're in violation of public interest.
22          It's significant that neither of the Gallaghers
23  raised the public interest concern when they put the million
24  dollars in their pocket, Your Honor. Instead, they're raising
25  it now as a way to avoid their contract, for which they

─── 12 ───

**[Page 13]**

1   received very valuable consideration. And it's clear that this
2   case is not about the public interest at all, but really about
3   the Gallaghers' interests.
4           The public interest here is in seeing that valid
5   contracts negotiated by parties at arm's length are enforced.
6   To the extent that the public interest needs to be examined at
7   all, it's in connection with the effect that the enforcement of
8   the covenant will have going forward on the public. Will it
9   create a monopoly, for example, or will it lead to a situation
10  where there's more likely to be a monopoly.
11          Your Honor, the information the defendants are
12  seeking here has no relevance whatsoever to that issue. What
13  they want are documents regarding a criminal indictment brought
14  against a single former employee of Laidlaw, who has since been
15  fired, for alleged bid-rigging in the summer of 1997, last
16  summer, in connection with bids made to a single school
17  district in New Jersey. No one at Laidlaw other than this one
18  individual has ever been implicated beyond -- in the case. And
19  it is true that Laidlaw has been indicted as well, but that's
20  because the New Jersey criminal statute creates automatic, as I
21  understand it, strict liability for employers for this type of
22  conduct. But there has never been any allegation that anyone
23  at Laidlaw was involved in this except this one individual, and
24  he was promptly terminated.
25          THE COURT: Let me stop you. Why is this relevant?

─── 13 ───

**— 14 —**

1   MR. SIEVE:  Your Honor, let me answer the question
2   you asked, okay?  The basic fact is that Judge Bassler is going
3   to have to, before he decides whether or not a preliminary
4   injunction is appropriate, look at the public interest prong,
5   and he's going to have to look at whether or not Laidlaw has a
6   trade secret or a protectable commercial interest.  And this
7   information is relevant to both prongs.
8        First of all, on the public interest prong, Laidlaw
9   has taken the position in their complaint and in their briefs
10  that enforcing this noncompete is somehow going to increase
11  competition in the schoolbus industry.  They themselves have
12  put at issue the very facts giving rise to their collusion and
13  their improper bid-rigging.
14       Secondly, if there is collusion in the industry, as
15  we allege there is, then there's very much an open issue about
16  whether or not there are any trade secrets at all.  It is quite
17  possible, as the allegations of the Attorney General state,
18  that Laidlaw and others in the business have been sharing
19  information and divvying up who's going to bid on what
20  schoolbus districts and sharing information on the amount of
21  the bids and what bids they're going to make.
22       So there is an issue about whether or not any of the
23  information they have is a trade secret and whether or not it's
24  commercial.  And one other point, Your Honor, before Mr.
25  Leonard jumps in because I see he's standing up.

**— 16 —**

1        Prior bids that had been opened in New Jersey.  That
2   information by New Jersey statute is publicly available.  We
3   provided that in our discovery responses to Laidlaw.  We asked
4   Laidlaw to provide the same information, so that we could
5   assess, as I said, whether or not there was anything
6   confidential or proprietary or whether they had any trade
7   secrets.  We —
8        THE COURT:  Where is that located in your — so I
9   know what we're talking about.
10       MR. SIEVE:  We're talking about Document Request No.
11  20 through 23, Your Honor, which is —
12       THE COURT:  Which —
13       MR. SIEVE:  — Exhibit C
14       THE COURT:  Exhibit C, okay.  And you're saying No.
15  23?
16       MR. SIEVE:  20 through 23.
17       THE COURT:  Oh, 20 through 23?
18       MR. SIEVE:  Right.
19       THE COURT:  "Number 20:  All documents pertaining to
20  any bid made by Laidlaw for schoolbus operations in Florida."
21       MR. SIEVE:  Right.  And what I've done, Your Honor,
22  23, for example, is, "All documents pertaining to contracts and
23  bids in New Jersey," for example, and 22 goes to documents
24  pertaining to bids made in New Jersey.
25       As I said, what I've tried to do is, I've tried to

**— 15 —**

1        I want to make this clear about the noncompete
2   agreement.  That noncompete provision was signed in 1987.
3   Okay?  Almost a decade ago.  And we do not deny that our
4   clients were paid one million dollars as consideration for
5   that.  But it expired by its own terms no later than 1994.  It
6   was a five-year provision.  What they're trying to do is impede
7   competition for a decade, and now they want it for another five
8   years into the year 2000.  It's totally unreasonable.
9        THE COURT:  I've heard enough.  I don't see any
10  reason for the criminal activity information.  I'm going to
11  deny the request.
12       It sounds to me that what you're talking about here
13  is this contract.  You may have otherwise very good defenses.
14  I don't see why we have to get involved in that.  You've
15  already got the information that there was an indictment.
16  That's enough.  I don't think we have to get involved in all
17  the underlying portions.  Let's go to the next issue.
18       MR. SIEVE:  Your Honor, the next issue concerns —
19  and I'm not sure what Laidlaw's position on this, so we may
20  have to ask them what their current position is.  But there
21  were document requests served by both sides seeking bids.
22  information pertaining to — information pertaining to bids
23  made by both my client and by Laidlaw in the schoolbus
24  industry, and I've broken that down into three categories, Your
25  Honor:

**— 17 —**

1   group these into three categories that I think make it a little
2   easier for the Court, but I'm happy to go through it one by one
3   if you want.
4        While you're looking at that, Your Honor.
5   Originally, and at least right now officially, the scope of the
6   requested relief is for an injunction in New Jersey.  That was
7   the original request that Laidlaw made a week ago when it filed
8   its complaint.
9        THE COURT:  Yeah.  Just as an aside, it was mentioned
10  to me that there's a motion pending expanding this issue to
11  jurisdictions other than New Jersey.
12       MR. SIEVE:  Nationwide.
13       THE COURT:  I'm not dealing with that.
14       MR. SIEVE:  Okay.
15       THE COURT:  So that will be dealt with in due course
16  through regular motion practice before Judge Bassler.  So I'm
17  not — that's not before me today.
18       Now let's just talk about these.  Why is it that you
19  need all documents pertaining to any bid made by Laidlaw for
20  schoolbus operations in Florida?
21       MR. SIEVE:  Well, because, Your Honor, and this goes
22  back to the scope of the relief they're seeking.  It was
23  unclear to us at the time they filed their motion for an
24  injunction what the geographical scope of the injunction was.
25  They have — they originally claimed that some of our